## Drane v. Drane.

March 28, 1947.

L. B. Handley, Judge.

Terry L. Hatchett and E. H. Smith for appellant.

George J. Ellis, Jr. and J. Wood Vance for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On February 8, 1946, the appellee (plaintiff below), Mary Emily Drane, filed this divorce action against her husband, the appellant (defendant below), M. L. Drane, in the Barren circuit court. The only ground for the relief sought as contained in the original petition was that "she and the defendant have lived apart without any cohabitation for five consecutive years next before this application." She stated that she was without means or estate and asked for an allowance pendente lite and for such an award of alimony upon the granting of the divorce as she may be entitled to on final submission.

Defendant answered denying the five years separation alleged in his wife's petition and sought by counterclaim a divorce from her, upon the ground that she had abandoned him for more than one year prior to the filing of his answer. The wife in response filed a pleading styled "Reply and Amended Petition" in which she denied the alleged year's abandonment of her husband,

as charged by him in his counterclaim, and then alleged the same ground as an amendment to her petition, and the further one that her husband "has habitually behaved toward her for not less than six months in such cruel and inhuman manner as to indicate a settled aversion to her and to destroy permanently her peace and happiness."

The additional grounds contained in that pleading of plaintiff were denied, in general terms, by defendant, thus making the issues. Proof was taken and on submission the court granted to the wife an absolute divorce, adjudged her the exclusive right as against her husband to occupy their dwelling situated about one mile from the city of Glasgow, and adjudged her temporary alimony of $125 per month until further orders of the court, and then adjudged this:

"In the event M. L. Drane shall predecease Mary Emily Drane there shall be paid out of his estate the sum of $6,000.00 to a committee for Mary Emily Drane, which said committee shall invest same under order of court and pay the net income therefrom to Mary Emily Drane so long as she lives; and if it should become necessary for her to encroach upon the principal to maintain the standard of living to which she is accustomed, she may do so subject to order of court; and that upon the death of Mary Emily Drane should any portion of the $6,000.00 fund, should said fund be established, be remaining at her death, then such residue if any, shall pass agreeable to the will of M. L. Drane and in the event of his death without making disposition of his property, shall then pass under the Kentucky laws of descent and distribution."

The husband was also adjudged to pay the costs of the action and $350 attorney's fees to Geo. J. Ellis, Jr. and J. Wood Vance. From that judgment defendant prosecutes this appeal against both his wife and her attorneys.

Only three witnesses testified in this case. The wife and her daughter, Laura Jean Drane, gave testimony for plaintiff, and defendant introduced no witness except himself. The proof shows, and it is admitted, that the couple were married in 1902 and five children were the fruits thereof, all of whom are now past the

adult age, and all of them are married with separate families, except Laura Jean, who makes her home with her parents and has been for many years working in her father's jewelry store as a clerk, sometimes as manager, and all the while as bookkeeper.

The evidence uncontradictedly shows appellant to possess a cold, callous and indifferent disposition toward both his wife and Laura Jean; and that he is and has been totally oblivious to the vows he took at the marriage altar to love, cherish, protect and support his wife so long as they might live, which promise is too often forgotten and not complied with in these modern times. He was also oblivious to the duties imposed by nature toward his own offspring. His conduct toward his wife and his children prior to 1922—when the greater part or, possibly, all of the children were then living at home —was such as that his wife filed an action against him for a divorce which she later dismissed on the ground, as she testified, that "he said he would do right and give me an income." She further testified that just before filing that divorce action defendant "got mad at me and beat on one of the boys with a stick and I asked him not to and I tried to take the stick away to keep him from beating his head off and he then started to whipping me." She then stated that she was sorry that she ever dismissed that action but that she did so "on account of the children." The undisputed proof also is, that his wife did the cooking without any hired help or other assistance, except what the unmarried daughters may have rendered before their marriage and departure from the family home. She also bought the family supplies and paid other expenses of running the household, and stated that defendant grumbled and criticized her for the amount thereof; when in 1930 he agreed to pay her $100 per month to defray such expenses which lasted for only two years, after which he on his own accord reduced that amount to $75 and required his wife to supply such necessities with that amount. He declined to install a telephone in the house, and it was done by the wife, or the daughter, Laura Jean.

Plaintiff also testified that she and her husband had lived separate and apart, but under the same roof, for more than five years preceding the filing of the action, she occupying and sleeping on the second floor in a room

just above the kitchen at the rear of the dwelling, whilst defendant occupied a room on the same floor, with an intervening room occupied by the daughter, Laura Jean. The only way that either of the spouses could reach the room of the other was by going down a stairway to the first floor and then up another stairway at the other end of the building. The wife also testified that there was no cohabitation between her and her husband for that period of time. Defendant denied that sweeping statement, but admitted that there had been no cohabitation between the two for something like 18 months prior to the filing of the action. The wife was asked this question:

"Q. Tell how you and the defendant have been getting along?

"A. Terrible. He blamed me for everything that went on and throwed up to me all the time that I wasn't nothing but an old cook and I would walk the chalk line or I'd be in the poor house. He'd say, 'I wish you would get away from here.' "

The proof also shows that defendant had not spoken to either his wife or to his daughter, Laura Jean, for the past two years. The latter in giving her testimony was asked:

"Q. What was the total cash received last year? (meaning the receipts of sales at appellant's jewelry store). (Our parenthesis.)

"A. $34,966.65."

She stated that the amount so received was only from "his shop as jeweler," and that the year's profit for 1945 was two-thirds of the amount of such gross sales. None of the above testimony, as given by the wife and the daughter—who substantially corroborated each other—was denied by defendant in his testimony, except the five year separation without cohabitation as testified to by the wife which he denied, but he admitted a substantial separation and abandonment for as much as 18 months before filing of the action.

However, we need not enter into a discussion of, or to determine the question as to whether or not the absence of cohabitive relationship between spouses oc-

cupying the same building constituted legal separation or legal abandonment within the contemplation of such statutory grounds for a divorce, since the cruel conduct charge of the wife against her husband is so overwhelmingly established, and in the main admitted by the defendant, that one wonders why she bore it as long as she did. No specific act or conduct, even faintly resembling cruelty on the part of the wife, is even hinted at in the testimony given by the defendant. On the other hand, as we have seen from the wife's testimony expressly supported by that of the daughter, he regarded his wife in no other light than that of a slave. If such conduct and such an assumed attitude does not create cruelty, it would be a difficult matter to define the term. It is at least "inhuman treatment," and furnished ample and sufficient grounds for the action of the court in granting to appellee a divorce, which brings us to a consideration of allowances made to the wife and the one to her attorneys.

The proof shows that the residence of the parties is a brick building located on six acres of ground about one mile from Glasgow, and worth at least $15,000, although defendant fixed the value at only $7,500. He admits that he bought and now has, or did at the time he testified, over $8,300 in U. S. bonds, but the daughter testified that he had bought and possessed more than $10,000 in bonds. He admits in his testimony that his business was worth $8,000; but whether that included the house in which he operates his business is not shown, nor did it apparently include any good will value. Defendant, therefore, is now earning, according to his own admission, $400 per month net, but which the daughter testified was much larger. Plaintiff is apparently penniless so far as the ownership of property is concerned. The record pictures her as a loyal wife and mother who bore the abuse and cruelties of her husband rather than to cause embarrassment to her children which would result from a decree of divorce.

The occupancy of the dwelling, as well as the monthly allowance, are each made subject to future orders of the court, as is stated in the judgment, and the monthly allowance might possibly cease upon the husband's death (a question we are not required to and do not now determine). The divorce having been granted the

wife, she would then not be entitled to her distributive share in his estate as his widow; hence the court required that in the event defendant died leaving his divorced wife surviving she would be entitled to the income from $6,000 out of his estate in lieu of a lump sum, or other permanent alimony. Such an order is not in violation of our statute, sec. 403.060, KRS, saying that no allowance to the wife "shall divest the husband of the fee simple title to real estate." The $6,000 trust fund provided for the wife after the husband's death is only an adjudged indebtedness against the husband's estate to his wife in the way of permanent alimony, which may be collected by proper enforcement proceedings available to any creditor for the collection of debts against a decedent's estate. Neither does the temporary occupancy of the dwelling deprive defendant of title to real estate in disregard of the statutory inhibition. The allowance of $6,000 as permanent alimony to the wife, coupled with the possibility of the husband dissipating his estate by the time she should become entitled to it, is by no means excessive, but rather meager. It cannot be corrected on this hearing, however, because no cross appeal has been prosecuted by the wife.

We do not regard the fee allowed plaintiff's attorneys sufficiently excessive to authorize a reversal of the judgment making the allowance.

Wherefore, the judgment is affirmed.

Judge Latimer disqualified, and did not sit in this case.